Filed 8/20/14  In re S.M. CA2/7

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| In re S.M., a Person Coming Under the Juvenile Court Law. | B251450 |
| | (Los Angeles County Super. Ct. No. CK96544) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | |
| Plaintiff and Respondent, | |
| v. | |
| SA. M., | |
| Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County, Anthony Trendacosta, Juvenile Court Referee.  Affirmed.

Cristina Gabrielidis, under appointment by the Court of Appeal, for Defendant and Appellant.

John F. Krattli, County Counsel, Dawyn R. Harrison, Assistant County Counsel, and Sarah Vesecky, Deputy County Counsel, for Plaintiff and Respondent.

_____

Sa. M. (Mother) appeals from the orders of the juvenile court removing her infant son, S.M., from her custody and granting a restraining order barring her from approaching her husband, Timothy M., and the baby. Mother contends neither order was supported by substantial evidence. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Mother and Timothy married in January 2012, and Mother became pregnant soon thereafter. Due to strains in their relationship, Mother moved into a shelter two months before S.M.'s birth in November 2012 at an Orange County hospital. Two days after S.M.'s birth, the Orange County Social Services Agency (OCSSA) received a referral from the hospital because Mother had tested positive for cocaine. She denied using drugs, and both she and S.M. tested negative nine hours later.

A second referral the same week alleged Mother had severely neglected S.M. during her interactions with him at the hospital. Hospital staff told an OCSSA social worker Mother became agitated and refused to feed the baby claiming he was too fat. She also ignored the baby and refused to feed him until she had showered. Although nurses had instructed her how to change and diaper the baby, they found his clothes and bedding soaked in urine. On one occasion a nurse saw Mother place S.M. on a bed and walk away despite staff warnings; on another Mother covered S.M.'s face with her hand to quiet him when he cried although S.M.'s breathing was apparently unaffected. Mother criticized hospital staff and asked that a white American pediatrician care for S.M. because she believed the Filipino doctors were "experimenting" on her.[1] Citing her

---

[1] Mother informed the worker she had emigrated to the United States from Pakistan in 2002. She had married a Pakistani man, but their marriage ended after nine years. Mother married Timothy in January 2012. She had not identified Timothy on the birth certificate but said he knew of S.M.'s birth. Once contacted, Timothy admitted he had a criminal history that included an arrest for domestic violence, used marijuana and had two daughters, now grown, who had been detained by the juvenile court when they were younger, resulting in the termination of parental rights. Timothy confirmed he and Mother were married but said he had asked Mother to leave their apartment because she was not paying her share of the bills. He later admitted he asked her to leave because she had attacked him.

"paranoid delusions and thoughts," a hospital psychiatrist placed Mother on a psychiatric hold pursuant to Welfare and Institutions Code section 5150.[2]

OCSSA filed a petition to declare S.M. a dependent child of the juvenile court pursuant to section 300, subdivisions (b) (failure to protect or inability to provide regular care due to mental illness or substance abuse) and (j) (risk of abuse or neglect based on abuse of siblings), based on Mother's positive cocaine test and behavior in the hospital, and Timothy's criminal history, past use of marijuana and alcohol and prior experience with the dependency system with his other children. At the November 29, 2012 detention hearing the juvenile court found a prima facie showing had been made that S.M. came within section 300 and there was a substantial danger to his physical health and no reasonable means to protect him without removing him from his parents' custody. S.M. was placed in the temporary care and custody of OCSSA, and the agency was ordered to provided services to Mother and Timothy including monitored visitation.

OCSSA filed a jurisdiction/disposition report on January 2, 2013 describing a number of interviews with Mother and Timothy, who were again living together. Mother told the social worker she had been discharged from the hospital after two days and there was nothing wrong with her. She also told the worker she had filed a police report against a doctor at the hospital who she believed had prematurely induced her labor. She complained about hospital staff, especially "fat" ones banging the doors and causing her baby to jump, but denied she had acted strangely with him at the hospital, saying she had been upset because his skin was not lighter like his father's. She denied using drugs and

---

[2]    Mother was discharged from the hospital after 48 hours and moved into Timothy's apartment. Her discharge instructions identify a preliminary diagnosis of "psychotic disorder NOS" (not otherwise specified), meaning her doctors could not make a definitive diagnosis without further evaluation. Her release signified she did not meet the criteria for retention under section 5150, subdivision (d), requiring a showing of probable cause that she was, "as a result of a mental health disorder, a danger to others, or to . . . herself, or gravely disordered."

Statutory references are to the Welfare and Institutions Code unless otherwise indicated.

agreed to drug test but expressed concern her sample would be switched with someone who used cocaine. She tested negative for drugs on four occasions in December 2012.

OCSSA also reported Mother had asked that S.M. be placed with a Muslim family and accused the worker of wanting to turn S.M. into a Christian. In one meeting Mother told the social worker "I want my baby back. If you want to keep him then you need to sacrifice." During her monitored visits she asked the foster parents about their care of S.M. and their religion and complained variously that he looked too small, they were not feeding him enough, his hair was falling out and he was not sufficiently alert. Despite her initial worry the foster family was not Muslim and was not feeding S.M. properly, she agreed to leave him in that home but then changed her mind and demanded a more culturally appropriate home closer to Los Angeles. During this period the OCSSA received three calls from state and local law enforcement agencies recounting complaints from Mother about the care S.M. was receiving and claiming his life was in danger. After an early January 2013 visit, Mother accused the foster father of bringing a different baby and demanded a blood test to prove the baby was hers.

In his interview with the social worker Timothy denied having a substance abuse problem and explained he drank occasionally and used marijuana twice a week to help him fall asleep after long work days. According to Timothy, Mother's erratic behavior had been triggered by cocaine, but he also agreed there were cultural and translation issues. In his view she had difficulties with social skills, and her paranoia was related to an inability to assimilate and understand social cues. However, he expressed concern about Mother's ability to parent S.M. in his absence. During visits he spent much of the time calming her anxiety and assuring her everything would work out.

The OCSSA recommended the juvenile court sustain the petition and transfer the case to Los Angeles County for disposition based on the parents' place of residence. At a January 2, 2013 hearing the court found Timothy to be the presumed father. At a subsequent hearing the court recorded that Timothy and Mother had submitted on the petition as amended and transferred the case to Los Angeles County. On February 11, 2013 the Los Angeles juvenile court accepted the transfer of jurisdiction from Orange

4

County, appointed counsel and ordered S.M. to remain in shelter care while the Los Angeles County Department of Children and Family Services (Department) assessed Timothy's home for placement. The Department was also given discretion to liberalize visitation "up to include release to father."

A disposition report prepared by the Department disclosed Timothy had asked Mother to leave the apartment during her pregnancy because she had attacked him on several occasions. Timothy showed the social worker photographs from wounds he said had been inflicted by Mother. Because of Mother's sometimes violent behavior and hostility toward him during visits with S.M., Timothy asked that her visits with the child take place separately out of the apartment and urged that, once Mother had left the apartment, S.M. could be placed with Timothy. Mother agreed with the proposed placement of S.M. with Timothy: "Please give my child to the father. I will do what the court wants me to do so I can have my baby back. You people should not have my child. He is starving to death; you are trying to make him a Christian and a Hispanic." Mother's anxiety and contentiousness during monitored visits with S.M.[3] led the Department to recommend the baby remain in shelter care until Mother had left Timothy's apartment and S.M. could be placed with his father. Placement with Mother was not recommended due to her previous psychotic behavior and failure to obtain recommended counseling and evaluation.[4] On the eve of the hearing, however, due to Timothy's continued marijuana use and failure to take recommended parenting classes, the Department withdrew its recommendation S.M. be placed with him.

---

[3]     During an April 2013 visit Mother became agitated while trying to feed S.M., argued with the social worker and placed an emergency call claiming S.M. was ill. She verbally abused responding paramedics, who asked that she be removed from the room. The paramedics checked the baby and found nothing wrong.

[4]     Mother went for an assessment at a community mental health center but failed to report any previous psychiatric history or present symptoms. The center determined she failed to meet agency criteria and gave her a letter stating so. A Los Angeles County health facility similarly denied services because of Mother's denial of any symptoms or history.

The disposition hearing began on April 17, 2013. Timothy's attorney filed a request for a restraining order against Mother based on threats she had made against Timothy and his landlords, who sometimes cared for S.M. Mother's counsel sought relocation of visits to a local mosque with a culturally sensitive monitor. The court granted those requests[5] and released S.M. to Timothy over the Department's objection. The court also ordered Mother to undergo an Evidence Code 730 evaluation by Daniel Kramon, a psychologist. The hearing was then continued to June 11, 2013 for Mother's contest. It was ultimately completed on August 29, 2013.

On May 9, 2013 Mother was allowed to visit with S.M. at her mosque. The visit was monitored by an East Asian social worker. According to the monitor, Mother fed the baby at 3:20 p.m. and when he started to fuss 20 minutes later, tried to feed him again. When the monitor suggested she should try to soothe the baby by walking or playing with him rather than feeding him again, Mother became defensive and stated, "you are not his mother," and "who are you to tell me what to do?" Resisting the monitor's efforts to calm her, Mother telephoned Timothy and another social worker to complain the monitor would not let her feed S.M. She then yelled at the monitor, "You don't have children, so you don't know how to take care of my child," and accused her of being jealous of Mother's husband and baby. S.M. began crying; and Mother refused to let him sleep, saying he should not sleep during her visit. The monitor persuaded Mother to allow her to hold S.M., who soon fell asleep, prompting Mother to accuse the monitor of showing off; she then attempted to seize S.M. from the monitor's arms. When Mother continued to yell at the monitor, the director of the mosque told the monitor the mosque would no longer host Mother's visits because her outbursts were interrupting those who were praying. After the visit the monitor recommended Mother receive additional parenting classes because she was incapable of caring for her child. The monitor also stated she would not be able to monitor any further visits between Mother and S.M.

---

[5] Because Timothy's counsel failed to make corrections to the restraining order as directed by the court, this order was never issued. The court granted a second request for a restraining order on June 11, 2013.

Dr. Kramon contacted Mother by telephone and interviewed her on May 10, 2013, the day after the visit at the mosque. According to Kramon, Mother "presented as alert, oriented, relatively logical and although she was coherent during the interview, there was an occasional tendency towards bizarre content reflective of paranoid, suspicious type ideations. . . . She also appeared to be anxious, and it is plausible that her degree of paranoia and suspiciousness can be greatly exacerbated when she is experiencing acute anxiety." Mother denied having suspicious thoughts or panic attacks but described her recent visit at the mosque and how angry she became at the monitor. While she spoke her voice escalated and, "by the end of her description . . . , [she] was yelling on the telephone." Mother justified reports of her yelling in the presence of her son on the ground, "in my country, people talk louder" and, when upset, "louder still." Mother confirmed earlier reports of her suspicions the doctors had tried to harm her and the wrong baby had been brought to an earlier visit. Kramon concluded that, despite Mother's pleasant demeanor, "the content of much of her communication was characterized by suspicious type thinking, paranoid and bizarre ideations, likely distortion of reality and obsessive and rigid type thinking. . . . It is likely that when she perceives herself to be in a stressful situation, her anxiety significantly escalates, therefore exacerbating and intensifying the paranoid symptoms." Kramon noted the possibility of extended postpartum depression, but concluded (citing Mother's report of hearing her mother's voice in 2002 shortly after arriving in the United States), "there are indications of paranoid tendencies that can be associated with a Paranoid Personality Disorder and/or Paranoid Schizophrenia." "A more specific diagnosis would be best determined by a more extensive evaluation, involving psychiatric/psychological consultations on a protracted basis but . . . , there are no current indications that the agitated/acting-out behavior . . . would be moderated without significant mental health intervention." Kramon recommended Mother receive individual psychotherapy and be evaluated for possible psychotropic medication; continue to have monitored visits with S.M.; that "all efforts be made to find a monitor with whom she feels compatible"; and reunification be deferred until there are reports of stabilization of her symptoms.

Throughout the months of May and June 2013 Mother lodged numerous complaints with the court, as well as the Los Angeles Police Department (LAPD), accusing the Department of abusing her child and discriminating against her.[6] She sought new counsel through a *Marsden* motion and, when that was denied, filed a section 388 petition seeking modification (reconsideration) of that decision. She solicited letters of recommendation from others in her shelter, attended parenting classes, participated in counseling and was prescribed psychotropic medication by mental health providers. She continued to test negative for illicit drug use. Meanwhile, Timothy tested positive for marijuana and failed to attend parenting classes ordered by the court. In a supplemental report, the Department recommended S.M. be suitably placed.

At the August 29, 2013 continued disposition hearing, the court appointed new counsel for Mother and proceeded to make final disposition orders. The court removed S.M. from Mother's custody and, notwithstanding the Department's recommendation, ordered him placed with Timothy.[7] The court also extended the existing restraining order for a period of one year.

## DISCUSSION

1. *Substantial Evidence Supported the Disposition Order Removing S.M. from Mother's Custody*

Section 361, subdivision (c)(1), authorizes removal of a child from his or her parent's custody only if the juvenile court finds by clear and convincing evidence that "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being" of the child if the child were returned home and "there are no reasonable means by which the [child]'s physical health can be protected without removing" the child from his or her parent's custody. "The parent need not be dangerous and the child need not have been actually harmed for removal to be appropriate. The

---

[6]     After one such report, an officer advised a social worker to be careful around Mother, as something about her was "off."

[7]     S.M. was subsequently removed from Timothy's custody at a section 387, subdivision (b), hearing in March 2014.

focus on the statute is averting harm to the child. [Citations.] In this regard, the court may consider the parent's past conduct as well as present circumstances." (*In re Cole C.* (2009) 174 Cal.App.4th 900, 917; see *In re Christopher R.* (2014) 225 Cal.App.4th 1210, 1215-1216.)

We review the juvenile court's disposition orders for substantial evidence. (*Los Angeles County Dept. of Children & Family Services v. Superior Court* (2013) 215 Cal.App.4th 962, 966; *In re R.C.* (2012) 210 Cal.App.4th 930, 940.)[8] Under this standard "[w]e review the record to determine whether there is any substantial evidence to support the juvenile court's conclusions, and we resolve all conflicts and make all reasonable inferences from the evidence to uphold the court's orders, if possible." (*In re David M.* (2005) 134 Cal.App.4th 822, 828; accord, *In re Christopher R., supra,* 225 Cal.App.4th at p. 1216; *In re Drake M.* (2012) 211 Cal.App.4th 754, 763; *In re Savannah M.* (2005) 131 Cal.App.4th 1387, 1393.)

Mother contends, in light of her lack of any history or diagnosis of a specific mental disorder, the juvenile court lacked adequate evidence to warrant removal of S.M. from her custody. While Mother is correct no definitive diagnosis of a mental disorder had yet been made, Dr. Kramon's report stated his opinion Mother had disturbing symptoms that would require "significant mental health intervention" to enable her to cope with her paranoid thought processes. In his view Mother was not stable enough to allow her to parent S.M. That report, coupled with the multiple witness accounts of

---

[8] "The burden of proof at the jurisdiction phase in the juvenile court is preponderance of the evidence; the burden of proof at disposition is clear and convincing evidence. (§ 355, subd. (a) [jurisdiction findings by preponderance of evidence]; § 361, subd. (c) [disposition findings by clear and convincing evidence].) Nonetheless, we review both jurisdiction findings and the disposition order for substantial evidence. (See *Sheila S. v. Superior Court* (2000) 84 Cal.App.4th 872, 880-881 ['The "clear and convincing" standard . . . is for the edification and guidance of the trial court and not a standard for appellant review. [Citations.] "'The sufficiency of evidence to establish a given fact, where the law requires proof of the fact to be clear and convincing, is primarily a question for the trial court to determine, and if there is substantial evidence to support its conclusion, the determination is not open to review on appeal.'"']." (*In re Christopher R., supra,* 225 Cal.App.4th at p. 1216, fn. 4.)

9

Mother's agitation around S.M., her violent outbursts toward Timothy and her antagonism toward anyone in a position of authority, provided the court with ample evidence to remove S.M. from her custody. As devoted as Mother was to S.M., her paranoia and anxiety gave rise to serious concern among the professionals who observed her as to her mental stability around an infant. (See *In re Rocco M.* (1991) 1 Cal.App.4th 814, 824 [Cases finding a substantial physical danger to a child "tend to fall into two factual patterns. One group involves an *identified, specific hazard* in the child's environment—typically an adult with a proven record of abusiveness. [Citations.] The second group involves children of such tender years that the absence of adequate supervision and care poses an inherent risk to their physical health and safety."].) As numerous courts have recognized, a juvenile court need not wait until a child is seriously abused or injured to assume jurisdiction and take steps necessary to protect the child. (See, e.g., *In re N.M.* (2011) 197 Cal.App.4th 159, 165; *In re Christopher R., supra,* 225 Cal.App.4th at p. 1216.)

> 2. *The Juvenile Court Did Not Abuse Its Discretion in Issuing the Restraining Order*

Section 213.5, subdivision (a), permits a juvenile court to issue an order "enjoining any person from molesting, attacking, striking, stalking, threatening, . . . harassing, telephoning, . . . destroying the personal property, contacting, either directly or indirectly, by mail or otherwise, coming within a specified distance of, or disturbing the peace of any parent . . . ." Section 213.5 has been analogized to Family Code section 6340, which governs restraining orders under the Domestic Violence Prevention Act (DVPA). (See *In re C.Q.* (2013) 219 Cal.App.4th 355, 363-364; *In re B.S.* (2009) 172 Cal.App.4th 183, 194.) That statute "permits the issuance of a protective order under the [DVPA] in the first instance, if 'failure to make [the order] may jeopardize the safety of the petitioner . . . .' (Fam. Code, § 6340, subd. (a); see also Fam. Code, § 6320.)" (*In re B.S.,* at p. 194.) A restraining order issued after notice and hearing may remain in effect up to three years. (§ 213.5, subd. (d)(1).)

10

In determining whether to issue the restraining order, the court may review and consider the contents of the Department's file, including the caseworker's written reports. (Cal. Rules of Court, rule 5.630(d)(1).) "Issuance of a restraining order under section 213.5 does not require 'evidence that the restrained person has previously molested, attacked, struck, sexually assaulted, stalked, or battered the child.' [Citation.] Nor does it require evidence of a reasonable apprehension of future abuse." (*In re C.Q.*, *supra*, 219 Cal.App.4th at p. 363, quoting *In re B.S.*, *supra*, 172 Cal.App.4th at p. 193.)

An appellate court applies the substantial evidence standard of review to the trial court's factual findings in support of the order (*Sabbah v. Sabbah* (2007) 151 Cal.App.4th 818, 822) and an abuse of discretion standard to review the grant or denial of the restraining order. (See *Gonzalez v. Munoz* (2007) 156 Cal.App.4th 413, 420 [DVPA].) The trial court abuses its discretion when its ruling exceeds the bounds of reason. (*Ibid.*) "'When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court.'" (*Ibid.*, citing *Shamblin v. Brattain* (1988) 48 Cal.3d 474, 478-479.)[9]

In this case the Department's reports cited instances of Mother's attacks on Timothy, her antagonism towards monitors and other professionals engaged in oversight of S.M. and her threats toward the landlords as evidence of her violent tendencies and potentially unstable behavior. Again, the law does not require a court to wait until an

---

[9]    *In re Cassandra B*. (2004) 125 Cal.App.4th 199, 210 to 211, cited by both parties, applied a substantial evidence standard of review to an order granting a restraining order under section 213.5, subdivision (a). *In re Cassandra B.* cited *In re Misako R.* (1991) 2 Cal.App.4th 538, 545, as authority for applying that standard of review. *In re Misako R.*, however, involved appellate review of a reunification plan in a dependency action, not a restraining order. In light of both the general rule that a grant or denial or injunctive relief is reviewed for abuse of discretion (*Gonzalez v. Munoz, supra,* 156 Cal.App.4th at p. 420) and the use of the abuse of discretion standard of review in other dependency matters requiring the weighing of evidence (see *In re Stephanie M*. (1994) 7 Cal.4th 295, 317-318), we question whether *In re Cassandra B.*'s application of the substantial evidence standard of review is correct.

attack occurs before an action is taken to protect a child and his or her caregivers. The juvenile court did not abuse its discretion in issuing the restraining order.

**DISPOSITION**

The juvenile court orders are affirmed.

PERLUSS, P. J.

We concur:

ZELON, J.

SEGAL, J.[*]

---

[*] Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.